Nextbag Web 2016 Beneficial Packaging Corporation v. Manuela Good morning. Please the court's counsel, Joe Brinke on behalf of plaintiff appellant graphic packaging. This is a manifest way to the evidence case and in determining whether or not this court will overturn the commission's findings, you need to look at whether there was a substantial foundation in the evidence. The manifest way to the evidence is clearly evident, plain and undisputed weight of the evidence. And in this matter, plaintiff feels that the manifest way to the evidence does not support the commission's findings here. Wasn't there sort of a credibility battle between O'Keefe and Dr. Alteri? Didn't didn't their opinions conflict? Absolutely. Every doctor's opinion conflicted with Dr. O'Keefe's. Well, what does that what does that mean then? Isn't it up to the commission to decide the weight and the credibility of the witnesses? Yes, it is. We don't we can't reweigh that. You recognize that, right? We don't reweigh the evidence of the credibility findings. We can't do that. The commission itself felt that there was credibility issues with Dr. O'Keefe's opinion. And that's really where the thrust of plaintiff's argument is here. The commission found on one hand that this was a simple case where the defendant injured her hand by placing her pinky finger into a roller of a conveyor belt on a production line. And then she suffered a left fifth trigger finger injury. This is to the owner's side of the hand. There was treatment that was consistent with that injury. She testified that this treatment was just for this injury right here for several months. It was not until 2007 when Dr. O'Keefe started to note other types of complaints. And he put it down to carpal tunnel syndrome. But he noted some older nerve complaints as well, beginning at that time. Now, there were two there were two attorneys and insurance companies for the employer in this matter, three dates of accident. So Dr. Howard was the first respondent section 12 examiner examined the defendant three times found no evidence of any older nerve condition, left trigger finger only, and said she had reached MMI in the fall of 2006. Dr. Avery similarly examined the defendant examined all the negative electro diagnostic testing performed in his physical exam and felt there was no evidence of any older nerve pathology. And he said specifically there was nothing that's related to a July 22nd thousand way who said that? This is Dr. Avery. And he was not the section 12 examiner for that. My data back since who is who is the respondent in this case? No, no, there's only one employer. It's graphic packaging. Yes. So don't start with this insurance company, that insurance company, graphic packaging is the employer. Correct. But there were two section 12 examiners. So these two section 12 examiners found that there was no evidence of carpal tunnel syndrome. And there was, I believe, five electro diagnostic tests that were performed. And these were interpreted by the commission itself as finding equivocal to negative findings of carpal tunnel syndrome. And then the there was any carpal tunnel syndrome. And it certainly was not related to a July 22nd 2005 date of accident. So the relying on the opinions of those two doctors and the negative electro diagnostic testing women, Dr. O'Keefe specifically opine, quote, the claimants July 22nd 2005 workplace accident caused aggravated or accelerated her ulnar nerve condition, remarking that the claimant had never had any pain complaints or other symptoms in her left hand before the date of the accident. Did O'Keefe say that? Yes, he did, among other things. Okay. So why can't the commission hang their head on that finding alone? The commission, on one hand, they do hang their head on that, but they also say they find, Dr. O'Keefe had recommended a carpal tunnel release procedure. He had diagnosed carpal tunnel syndrome consistently when the defendant was authorized off work, it was carpal tunnel syndrome. In the deposition, he opines several times the carpal tunnel syndrome was related to this date of accident. The commission says, yeah, we don't buy any of that. We don't believe that. And so I feel it's inconsistent for the commission. So he's got to be right on both, right? Right. He also can the commission parse that and say there is evidence that he's wrong on carpal tunnel, that there is evidence that he's right on ulnar nerve. I mean, that's the question, because that's your argument. The commission's decision doesn't explain how his opinion on the ulnar nerve pathology is any different from his position on the carpal tunnel pathology. But you seem to be saying, in response to Justice Holder's question, is there some doctrine in the law that says they can't believe him, his opinion on one issue, if they disbelieve him on another issue? Is there anything that says that? I think you can find the answer is no. No, I don't know. I mean, it's a good argument, because you've got to try to erode the opinion of the commission. I'm just saying that he's just too inconsistent to give any credence to on either issue. And therefore, the section 12 examiners and the other doctors, they never wavered. Correct. That's your argument. My argument is this is a manifest way to the evidence, and the commission itself is telling you they don't find any weight in Dr. O'Keefe's opinion. On one issue? On one issue. Yes. If you can cite me to a case that says that they have to reject his testimony in its entirety, please do. I don't know. You can say it stands to reason. I mean, you know that. And then start talking about how wonderful the other section 12 doctors are. That's a good introduction, by the way. It stands to reason. It definitely stands to reason that the commission itself that is assigning little weight to the opinion of Dr. O'Keefe here. I don't think that there's any question when you read the commission's findings here. They gloss over the whole carpal tunnel issue because they don't want to discredit the guy that they're pinning their decision on. Now, besides the issue of whether or not there was even an ulnar nerve pathology, the commission gets into the issues of TTDE, whether prospective medical is required. And that's where I believe there are some serious issues there because there is no recommendation for an ulnar nerve release. And the commission is stating that the defendant should be seen, Dr. O'Keefe, for an examination of ulnar nerve pathology and then potential ulnar nerve treatment here. There was already four negative electrodiagnostic tests for ulnar nerve pathology that found nothing. There is no recommendation at the time of the trial for any further care for an ulnar nerve condition. So this is essentially a prescription coming from the commission for a doctor that they're saying has continuously tried to perform a surgery for a condition they do not believe exists. For those grounds alone, I believe that portion of the commission's findings should be reversed. Now, what about your argument to claim it was not entitled to TTDE benefits beyond November 6, 2006? What are you basing that on? Basing that on Dr. Heller and Dr. Atlery's opinions. That totally rests on your attack on O'Keefe's opinion, right? I mean, they go hand in hand. Yes, there is that. And then also, beyond that point, not until 2007 does Dr. O'Keefe begin to diagnose ulnar nerve symptoms, which would be the condition the commission felt was related. So only until at that point would any further TTDE be related to an ulnar nerve pathology. Now, at the same time that he's... I understand. If it was injured, if the claimant was injured on July the 22nd, 2005, why wouldn't any TTDE attributable to the ulnar nerve pathology after that date? Why wouldn't any miswork attributable to that condition not entitle the person to TTDE? Beyond that point, Dr. O'Keefe authorized the defendant to offer for multiple conditions. And so it's impossible to say whether it was for carpal tunnel syndrome, neck symptoms, or an ulnar nerve pathology. The opinion of Dr. O'Keefe was that she needed a carpal tunnel release. And so this would indicate that this is the serious condition that is keeping her from performing any type of employment requiring any restrictions. Who's Dr. Alturi, by the way? Dr. Alturi is the Section 12 examiner for the second and third dates of accident. He did not find the claimant who reached MMI by the time of the hearing either, did he? Nobody felt that no condition that she had at that time was related to July 22nd, 2005 date of accident. He also recommended additional electrodiagnostic testing, which was performed afterwards and found negative bilaterally. And I believe there was a negative cervical radiculopathy, which was one theory for the complaints. At trial, the ulnar nerve pathology is not consistent with an ulnar nerve pathology. The ulnar nerve is going to have its entrance into the forearm at the elbow. There's a lot of confusion in the commission's decision that anything related to mentioning the ulna shows this consistent ulnar nerve pathology. When you have your forearm down, the ulna is this bone right here, one of the two bones in your forearm. So any complaints for left fifth finger injury are going to be on the ulnar side. So, excuse me, the commission picks up on physical therapists and chiropractors' notes saying there are complaints on the left-hand side, on the ulnar side, and states that that is somehow a justification that there was consistent ulnar nerve pathology from the date of the accident forward. Are you aware of a line of cases, or is there a line of cases, where it's actually deemed to have special knowledge, superior knowledge in medical matters? Right? Yes. But in this particular case, the commission is relying upon this doctor's opinion that doesn't match with its simultaneous opinions that he has no credibility. We're back to that again. But your argument seems to be the commission should have adopted our doctor's opinions as opposed to O'Keefe's opinions because they're supported by X, Y, and Z. The problem is they determined the credibility, and they determined a way to be given a medical evidence, and they decided to adopt O'Keefe's opinion as to the ulnar nerve condition. And so now the question becomes, why is the opposite conclusion clearly apparent other than to tell us that they should have believed our doctors? The opposite conclusion is clearly apparent because I believe the commission's decision shows that they had very little opinion of Dr. O'Keefe's opinion. Well, he had enough opinion to rest their decision on his opinion. They had enough faith in his opinion to rest their entire decision on it. I mean, it's a credibility question, isn't it? Why is it under credibility? I believe it's a way to the evidence and that the commission acknowledges the weight of Dr. Atler and Dr. Heller's opinions for carpal tunnel syndrome, but just chooses not to for sake of this decision for the ulnar nerve pathology. And I just don't believe that that inconsistency is in accordance with the manifest way of the evidence. Arguing the inconsistency, you're better off arguing that the opinion was not based on any evidence in the record. Whether the doctor consulted some astrological alignment in making the opinion, or as my learned colleague, I'm surprised he has an opinion today, says the doctor arrived at his house with 10 trails of chickens. Then you have something there, but you've got to get away from saying, well, he wasn't credible because of this, that, and the other thing. That's up to the commission. So was his opinion, was it not based on any credible evidence? You can't say that, can you? Well, there was no electrodiagnostic imaging that supported his findings. That's probably your better argument. In addition, if you look in his deposition transcript, he's basically saying this could be related, that could be related, could be related to this date of accident, that date of accident. He says this could be a specific accident. This could be a repetitive trauma. This could be 2005, could be 2007. This could be a collateral, or excuse me, a albatross syndrome case. Could be ulnar nerve release. Whatever you want me to do, I'll do it. In the deposition, I think that definitely supports that his opinion that some ulnar nerve pathology is not based on any objective evidence that you can find in the record. They've tested this defendant multiple times in the hopes that she would manifest something that he could treat to continue some treatment, and it never occurred. I have to give you credit for picking up on what we're trying to tell you. Move inexorably to the right. You'll have time on the block. And you can May it please this Honorable Court, Mr. Brenke, my name is Matt Walker, here today on behalf of the employee, Consuelo Castaneda. The Commission's decision finding that the ulnar nerve condition was related to the July 22nd, 2005 industrial injury is not against the manifest way of the evidence and should be affirmed. As was previously discussed, Dr. O'Keefe, the treated surgeon, did July 22nd, 2005 work accident. And Dr. O'Keefe's opinion is supported by the early medical record. The advocate chart note from July 27th of 2005, which was the company clinic, the first chart note after the date of accident, merely five days after the injury, stated that the diagnosis included not only the injury to the left fifth digit, but also ulnar neuritis. That was documented in that first report? Yes, Your Honor. Advocate Occupational Health examined her on August 4th of 2005, noting tenderness over the medial aspect of the left fifth digit, accompanied by tenderness over the ulnar aspect of the left hand. When Ms. Castaneda began treatment with neck and back, the initial evaluation by therapist Jeff Good on August 22nd, noted constant pain in the left fifth digit and lateral border of the left hand, pain referred all the way up the left upper extremity, tenderness along the ulnar border of the left forearm, and gross limitations in both the left at wrist and elbow movement. Recommendations and notations referencing both the left elbow and the forearm occur again from the neck and back clinic on September 14th of 2005, November 2nd of 2005, and December 19th of 2005. It was previously discussed, or Dr. Held's opinions were also previously discussed. Dr. Held was a respondent section 12 examining physician. He testified and he was asked directly about notes from August of 2005 and the notes in April of 2007. He was asked to comment on the August 8th, 2005 chart note from the company clinic, and he was asked by plaintiff's counsel whether complaints of pain and numbness traveling from the middle finger into the forearm supported a diagnosis of carpal tunnel syndrome. And Dr. Held, the examining physician's quote, no, because in that case, they stated it was the left middle finger to the forearm, so that would be the ulnar nerve rather than the median nerve. Dr. Held was also asked to comment about the April 8th, 2007 EMG and CV report and was directed by the attorney to the clinical history described by the defendant, I'm sorry, by Ms. Castaneda as experiencing paresthesias in her left hand for approximately one year and continuing to experience numbness and pain in her left forearm. Dr. Held, the examining physician's response was, quote, that sounds like ulnar nerve rather than median nerve. And he restated that again five lines down the page when asked whether this could be carpal tunnel syndrome. His response again was no, I think that would refer to the ulnar nerve. Dr. Atluri, who also served as a section 12 examining physician, examined the employee on July 18th of 2008, and he charted the defendant's physical examination, revealed some irritation to the ulnar nerve at the elbow. His treatment recommendations were conservative in nature, and he did opine that consideration could be given to an ulnar release if the petitioner's condition was not relieved by conservative measures alone. So ulnar nerve symptoms and complaints were continuous from July 22nd, 2005 accident all the way through petitioner's testimony at the hearing in December of 2009. Counsel references the negative EMGs and implies that a positive EMG is needed in order for the commission's decision to meet the manifest weight standard. But a positive EMG is not a requirement for a diagnosis of ulnar nerve disorder or cubital tunnel syndrome. Dr. Heller, the section 12 examining physician, testified to as much during his deposition. Page 47 of his deposition or 1033 in the record. Dr. Atluri, who was a section 12 examining physician, did not require a positive EMG to render a diagnosis of ulnar nerve irritation. He didn't need a positive EMG to make a recommendation for conservative treatment to the ulnar nerve, and he didn't need a positive EMG to make a recommendation or opine that potential surgical intervention was necessary. Well, the commission didn't even have to rely on Dr. Atluri, did they? Not at all. What's your argument about the TTD and the award of medical expenses? As far as the TTD and the discussion of no benefits being awarded past November 5th of 2006, Ms. Castaneda did return to work based upon the opinions of Dr. Bowman, who had taken over for Dr. O'Keefe in November of 2006. And he released her to return to work. Ms. Castaneda sought out Dr. O'Keefe because she didn't want to continue treatment with Dr. Bowman. Dr. O'Keefe reimposed restrictions. So the restrictions continued at that time. When she was terminated on May 15th of 2008, she was still under the care and treatment of Dr. O'Keefe and was still under medical restrictions. She had not reached maximum medical improvement, so therefore, a TTD would be doable and only up through the date of the hearing, the 19B hearing in December of 2009. And what about prospective medical? As far as prospective medical, Your Honor, I think the commission's award was very conservative in nature. They're awarding one visit to Dr. O'Keefe. Counsel talked about a surgery and additional treatment. We were awarded one opportunity to go to Dr. O'Keefe to see whether or not any additional treatment is necessary. At that point, the respondent would be entitled to another Section 12 examining physician, and we could fight this all over again if necessary. But right now, the conservative award for prospective medical is very reasonable and within the recommendations of not only Dr. O'Keefe, but if you take out the causation opinions of Dr. Atluri, Dr. O'Keefe's future medical recommendations basically meant it, Dr. Atluri's recommendations. So there's no real credibility issue as far as documented diagnosis of the ulnar nerve. The question is whether or not it's causally related to July 22nd of 2005. Based upon the early ulnar diagnoses in the record and Dr. O'Keefe's opinion at the time that he testified in the evidence deposition, the commission had ample evidence in the case. Now my point goes into detail about some ulnar nerve, seemingly ulnar nerve related complaints from 2005 on. However, none of these arose to the level of anyone diagnosing any ulnar nerve pathology until 2007. As I mentioned before, this is... What about the argument they were focusing on the other issues? An ulnar nerve pathology is going to manifest in these two digits, the left fifth finger and then half of the fourth finger. Carpal tunnel syndrome is going to manifest in these fingers here, the first three and half of this fourth, perhaps. Well, didn't he just say in the initial report there was a complaint about ulnar problems? Correct. The left fifth finger pathology is an ulnar problem. And because Dr. O'Keefe is the only physician who actually spoke directly to this, I will quote him on this, but he says that, yes, it's possible with an injury to the left fifth trigger finger, there's going to be some swelling here that's going to interfere with the nerves temporarily while the left fifth trigger finger condition is manifesting. So it makes perfect sense that there would be some type of complaints on this side. However, these complaints in 2005, they're not consistent with an ulnar nerve pathology. They don't radiate that way. Now, Dr. O'Keefe points out that in his deposition, he says, sure, these sound like ulnar nerve complaints. And they do. They're on the ulnar side, consistent with an ulnar nerve. He examined her three times in 2005 and 2006 and found no ulnar nerve pathology. It's inconceivable to say that he examined the left fifth finger and as a hand surgeon was unable to discern any ulnar nerve pathology at that time. In light of this, of Dr. Heller's findings of no ulnar nerve pathology, the ulnar nerve condition complaints, excuse me, in 2005 being no more than references to the left fifth trigger finger injury and the negative EMG, which were continuous throughout the course of this accident, there is no evidence to support an ulnar nerve pathology here. The only evidence was a left fifth trigger finger injury. There was a lot of talk about a carpal tunnel release, which the commission found was not credible at all. And this is sort of a leftover diagnosis, which was placed into the decision. Now, as there is no evidence to support the ulnar nerve pathology request, this court will find the commission's decision is against the manifest way of the evidence. Thank you, counsel. Thank you, counsel Bowles. This matter will take under advisement and a written disposition shall issue the court will stand in brief recess.